**Pages 1 - 55**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Andrew G. Schopler, Judge

DARRELL ISSA,
Plaintiff,

VS. NO. 25-CV-00598-AGS-JLB

SHIRLEY N. WEBER, et al.,
Defendants.

San Diego, California
Friday, May 16, 2025

**TRANSCRIPT OF MOTION HEARING**

**APPEARANCES:**

For Plaintiff:
JUDICIAL WATCH, INC.
425 Third Street Southwest, Suite 800
Washington, DC 20024
**BY: ERIC W. LEE, ESQ.**

For Defendant Shirley N. Weber:
CALIFORNIA ATTORNEY GENERAL
300 South Spring Street, Suite 1702
Los Angeles, California 90013
**BY: JENNIFER E. ROSENBERG, ESQ.**

For Defendant Curtis Morrison:
RED EAGLE LAW, L.C.
5256 South Mission Road, Suite 135
Bonsall, California 92003
**BY: CURTIS LEE MORRISON, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by: James C. Pence-Aviles, RMR, CRR, CSR No. 13059
Official Court Reporter

**APPEARANCES**: **(CONTINUED)**

For Defendant League of Women Voters of California:
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
**BY: ARI J. SAVITZKY, ESQ.**

ACLU OF SOUTHERN CALIFORNIA
1313 West Eighth Street, Suite 200
Los Angeles, California 90017
**BY: JULIA A. GOMEZ, ESQ.**

For Intervenor Defendants California Alliance for Retired Americans and Vet Voice Foundation:
ELIAS LAW GROUP LLP
250 Massachusetts Avenue Northwest, Suite 400
Washington, DC 20001
**BY: LALITHA D. MADDURI, ESQ.**
**WILLIAM KYLE HANCOCK, III, ESQ.**

**Friday - May 16, 2025** **10:00 a.m.**

**P R O C E E D I N G S**

---000---

**THE COURT:** Good morning, everyone.

**ALL:** Good morning.

**THE CLERK:** Please be seated and come to order.

Calling Matter Number 1, 25-CV-9- -- excuse me -- -598, Issa v. Weber, for a motion hearing.

Counsel, please state your appearance for the record.

**MR. MORRISON:** Curtis Morrison for Intervenor Defendant Curtis Morrison.

**THE COURT:** Good morning, Mr. Morrison.

**MR. HANCOCK:** Liam Hancock, from Elias Law Group, on behalf of Proposed Intervenors Vet Voice Foundation and the California Alliance for Retired Americans.

**THE COURT:** Good morning, Mr. Hancock.

**MS. MADDURI:** Lali Madduri on behalf of the same intervenors as Mr. Hancock.

**THE COURT:** Good morning.

**MR. SAVITZKY:** Good morning, Your Honor. Ari Savitzky, from the American Civil Liberties Union, on behalf of the League of Women Voters of California, proposed intervenors.

**THE COURT:** Good morning, Mr. Savitzky.

**MR. SAVITZKY:** Good morning.

**MS. GOMEZ:** Good morning, Your Honor. Julia Gomez on behalf of the League of Women Voters of California.

**THE COURT:** Good morning, Ms. Gomez.

**MR. LEE:** Good morning, Your Honor. Eric Lee on behalf of Plaintiff Congressman Darrell Issa.

**THE COURT:** Good morning, Mr. Lee.

All right. Well, I appreciate everyone --

**MS. ROSENBERG:** And --

**THE COURT:** Oh. Go ahead.

**MS. ROSENBERG:** Oh. Sorry.

Deputy Attorney General Jennifer Rosenberg appearing on behalf of Secretary Weber.

**THE COURT:** Good morning, Ms. Rosenberg, and welcome here remotely.

We don't have anybody else remotely; correct?

All right. Good.

**THE CLERK:** That's correct, Your Honor.

**THE COURT:** I appreciate everyone's papers. I do have a tentative ruling that I wanted to share with the parties to help focus the oral argument, based on the papers that I've read.

What I'll do is buckle up, and I'll -- I'll give you my fulsome views on the case, based on the briefing that I've read, and then I'll give oral argument to the parties. My -- based on the oral argument, I may change or modify my tentative

ruling, but I wanted to let everyone know where I'm at, based on the -- the written submissions so far.

My plan would be to give each side ten minutes for oral argument, and my courtroom deputy will keep track of the time for each of you. If you want to save any time for rebuttal, just make sure you stop talking before your ten minutes have run.

All right. Overall, my tentative is that the motions to intervene here, at ECF 6, 7, and 8, would be granted in part, and each of the proposed intervenors would be allowed to intervene as of right. Otherwise, the motions would be denied as moot, and I'll give you my reasoning for that tentative ruling.

First of all, the governing law here is that courts apply the following four-part test to determine if intervention as of right is proper under Federal Rule of Civil Procedure 24(a):

First, the application for intervention must be timely;

Second, the applicant must have sig- -- have a significantly protectable interest relating to the property or transaction that is the subject of the action;

Third, the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and

Fourth, the applicant's interest must not be adequately represented by the existing parties in the lawsuit, citing to

*Southwest Center for Biological Diversity v. Berg*, 268 F.3d 810, Page 817, Ninth Circuit, 2001.

The *Berg* court went on to say that, "In general, we construe" -- "construe Rule 24(a) liberally in favor of potential intervenors. In evaluating whether these requirements are met, courts are guided primarily by practical and equitable considerations," citing to *United States v. City of Los Angeles*, 288 F.3d 391, at Page 397, Ninth Circuit, 2002.

"By allowing parties with a practical interest in the outcome of a particular case to intervene, we often prevent or simplify future litigation involving related issues; at the same time, we allow an additional interested party to express its views before the court." That's from Page 398 of *City of Los Angeles*.

In this case, everyone agrees the applications are timely. The case is still in its infancy, and no answer has yet been docketed. So only the other three elements are in dispute. I'll deal with the second and third prongs of the analysis together, as most courts do; that is, whether there's a significantly protectable interest and whether there is any impairment of that interest.

The Ninth Circuit, in *City of Los Angeles*, held that an applicant has a significant protectable interest in an action if:

1. It asserts an interest that is protected under some law; and

2. There is a relationship between its legally protected interest and the plaintiff's claims.

The relationship requirement is met if the resolution of the plaintiff's claims actually will affect the applicant. The interest test is not a clear-cut or bright-line rule because no specific legal or equitable interest need be established.

Instead, the interest test directs courts to make a practical, threshold inquiry and is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.

Between them, the proposed intervenors identify four potential protectable interests, and I'll go through each of those in turn.

First, Morrison alone raises a potential protectable interest of his right to run as a candidate. In -- in my mind, this is the weakest protectable interest that has been proposed, and I think it is likely an insufficient relationship to qualify for intervention. Let's first consider the purported significantly protectable interest itself.

Like Congressman Issa, Morrison claims that two-thirds of the ballots received during the seven-day period at issue voted Democratic in 2024. Even if true, it's not clear that

enjoining this rule, or maintaining it, would affect Morrison's right to run as a candidate.

The parties cite many authorities for the existence of a right to stand for election, and having a fair election is probably derivative of that right. But Congressman Issa doesn't seek relief that would prevent Morrison from standing for election, nor does Representative Issa seek relief that would render the election unfair.

That is, Representative Issa doesn't ask that special rules apply to him. He wants the same rules to apply to everybody. And the rule he's advocating, that ballots must be received by Election Day, is the majority rule in the United States. No party has suggested that elections held under this majority rule are inherently unfair.

At best, Morrison may argue that this lawsuit could impair his ability to win an election, but I'm aware of no right to win an election, nor have the parties pointed to any law or legal authority that would protect such a right. So Morrison has not shown that he has a significantly protectable interest in this suit, at least as it regards his right to run as a candidate.

Yet even if Morrison had established such a protectable interest, it's not clear that the disposition of this lawsuit would necessarily impair it. After all, Morrison's candidacy -- candidacy has a primary, which would be unaffected

by the proposed injunction, and he would first have to win that primary before standing for the general election.

So even if Representative Issa wins this suit, it's guesswork as to whether plaintiff's claims will affect the applicant at all, to put it in the language of *City of Los Angeles*, at Page 398.

Thus, tentatively, I don't think Morrison can intervene as a matter of right, based on his potential future candidacy in a general election.

Moving on to the next proposed protectable interest, all of the proposed intervenors raise voting rights as a potential protectable interest. They submit that the right to vote would be impaired, whether it's a personal right in the case of Morrison or the rights of their members in the case of the other three proposed intervenors.

This protectable interest, I think, is on much firmer footing. The would-be intervenors, or their members, currently have a legal right -- that is, to have their votes counted so long as they are postmarked by Election Day and received within seven days afterwards -- and the relief here would impair or impede that legal right by removing it.

And I would cite, for comparison, to the *Berg* case, 268 F.3d, at Page 819, in which the *Berg* court noted that a would-be intervenor would lack a legally protectable interest when they had no existing legal right, contract, or permits

relating to the future timber sales at issue, which rendered their interest based upon a bare expectation and therefore not cognizable for intervention. I think that is a good counterpoint to the situation here, which I think is very distinguishable.

At any rate, the rote -- the right to vote itself is constitutionally guaranteed. Although Congressman Issa's suit does not prevent anybody from voting, even by mail, it arguably substantially impedes that right for each proposed intervenor.

And when an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene. This is citing again to the *Berg* case, at 822, which itself was quoting the advisory committee notes from Federal Rule of Civil Procedure 24.

In short, my tentative is that this interest is both protectable and impaired or impeded and therefore satisfies the second and third prongs of the intervention analysis.

Moving on to the third proposed protectable interest, the three organizational proposed intervenors all raise diversion of organizational resources. They argue specifically that they'll need to divert resources to change their outreach behavior and to educate or re-educate their members as to their mail-in ballot rights.

One could quibble with some of their points, but

ultimately I think this diversion-of-resources argument is well taken. Although the Ninth Circuit has not yet held that diversion of resources is sufficient to qualify as a significant protectable interest in this context, the district courts of our circuit appear to have unanimously agreed that it does qualify.

I'd cite, for example, to *1789 Found, Incorporated v. Fontes*, 2025 Westlaw 834919, at Page 3, District of Arizona, 2025; also *Issa v. Newsom*, 2020 Westlaw 3074351, at Page 3, Eastern District of California, 2020; and *Paher v. Cegavske*, 2020 Westlaw 2042365, at Page 2, District of Nevada, 2020.

Congressman Issa's only response to this point is that diversion of resources is a standing concept, not an intervention one, but the two are not mutually exclusive. While it certainly is a standing concept, the lower courts at least have unanimously agreed it can also serve as a protectable interest in this intervention context, and for good reason, I think.

As already noted, intervention decisions should consider whether the would-be intervenor would be substantially affected in a practical sense, according to the *Berg* court and the advisory committee notes.

The organizations here offer unrefuted declarations about the significant effort it would take to comply with a change in the law. They have established that they would need to divert

substantial resources to protect their members' interests in response to any court injunction.

This seems like the very definition of a practical effect. Thus, on this additional basis, tentatively, the three organizational proposed intervenors have satisfied the second and third prongs of the Rule 24(a) intervention test.

The fourth, and final, protectable interest that the parties have raised is proposed only by the League of Women -- Women Voters, which is that they have lobbied for this law. They specifically argue that Congressman Issa's relief would undo, by judicial order, the reforms that the League has championed, won, and defended in the political process. This is from ECF 8-1, at Page 17.

They go on to write that, "The League specifically supported altering the receipt deadline for mail ballots in order to prevent voter disenfranchisement, facilitate voting by mail, and ensure that those who vote by mail have the same opportunity to make a considered decision by Election Day as other voters," end quote.

Congressman Issa does not respond to this point at all, and so he has waived any counterargument, but I don't think that waiver really makes a difference on this point.

The Ninth Circuit has held, quote, "A public interest group is entitled, as a matter of right, to intervene in an action challenging the legality of the measure it has

supported," end quote. That's from *Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, Page 1397, Ninth Circuit, 1995. And that *Idaho Farm Bureau* case also collected cases that held the same.

Representative Issa does raise a counterargument, however, that purports to rebut all four of the stated protectable interests that I've just reviewed. Specifically, he contends that the intervention is inappropriate, even if they have protectable interests, if the would-be intervenors have other means to protect them; that is, they could bring their own lawsuits. So other means to protect their interest -- interests, absent intervention, exist.

And Congressman Issa cites to *Donnelly v. Glickman*, 159 F.3d 405, at Page 409. It's a Ninth Circuit case from 1999 -- 1998. But, respectfully, I don't think that's how this concept works or what actually happened in the *Donnelly* case.

In *Donnelly*, the proposed intervenors wanted their own money for gender discrimination, and the court held that the female plaintiffs' hostile work environment claims would not affect the proposed intervenors' claims that the Forest Service subjected male employees to discriminatory treatment. That's the *Donnelly* case, at Page 410.

By contrast, we've just gone over how the claims would affect the would-be intervenors' interests here. Unlike in *Donnelly*, the proposed intervenors here are not complaining

about some action by the defendant. They're worried that Plaintiff Issa's relief in this case would affect their rights.

Put another way, in *Donnelly*, whether the female plaintiffs got paid or not had no effect on whether their male proposed intervenors could bring their own lawsuit. By contrast, here the would-be intervenors must be in the suit to achieve their goal of preserving the current law and stopping Congressman Issa from enjoining it.

In fact, one of the other cases Congressman Issa relies on, I think, makes the difference clear. In *California ex. rel. Lockyer v. United States*, the Ninth Circuit found intervention-by-right appropriate for small farmers to whom the statute in question did not confer any rights. This is at 450 F.3d 436, Page 441, Ninth Circuit, 2006.

Instead, it required owners of larger farms to dispose of any excess land over a certain acreage at below-market rates. Nevertheless, the Ninth Circuit allowed the small farmers to intervene to defend the statute because they had no alternative forum where they could mount a robust defense of it.

I think the same is true here. Any injunction and final judgment in this court would, in fact, prevent the would-be intervenors from defending the statute at issue here, Section 3020, anywhere else because this Court would have already struck it from the State's code. The only forum they have to mount a robust -- robust defense of the statute and

prevent its potential injunction is this case. So, at least tentatively, I find that argument unavailing.

Moving on to the fourth, and final, prong of the analysis, then, the adequate representation prong, the law here is that, to be granted intervention as of right, the would-be intervenor must show, quote, "that the existing parties may not adequately represent the applicant's interest," end quote, from *Citizens for Balanced Use v. Montana Wilderness Association*, 647 F.3d 893, Page 898, Ninth Circuit, 2011.

Generally, the burden of showing inadequacy of representation is minimal and satisfied if the applicant can demonstrate that the representation of its interests may be inadequate.

In evaluating adequacy of representation, courts look to a number of factors, including, quote, "Number 1, whether the interest of a present party is such that it will undoubtedly make all of the proposed intervenor's arguments; Number 2, whether the present party is capable and willing to make such arguments; and Number 3, whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." That's all from the same page of the *Citizens for Balanced Use* case.

But the -- the most important factor, in assessing the adequacy of representation, is how the interest compares with the interests of existing parties. When that most important

factor is met by a sufficient showing, a presumption of adequate representation arises against the would-be intervenors.

Crucially, for our case, there is also an assumption of adequacy when the government is acting on behalf of a constituency that it represents, which must be rebutted with a compelling showing. This is all from the same case.

Since the Secretary of State here is defending the voting rights of her constituents, a presumption requiring a compelling showing has arisen -- arisen against the would-be intervenors.

The League of Women Voters calls into question whether this presumption is still appropriate after *Berger v. North Carolina State Conference of the NAACP*, 297 U.S. 179, specifically Page 1- -- 196. This is a 2022 Supreme Court case.

And it's true that there the Supreme Court appears to have tightened up the general level of interest comparison to require -- and required it to be identical before a presumption typically attaches.

The Ninth Circuit has noted this heightened identical standard in the case of *Callahan v. Brookdale Senior Living Communities, Incorporated*, 42 F.4th 1030 -- 1013, at Page 1021, Note 5, Ninth Circuit, 2022.

But the Supreme Court seems to have explicitly accepted

and continued to endorse such a presumption when a member of the public seeks to intervene to defend a law alongside the government. This is from the *Berger* case, at Page 196.

Critically, after discussing the government presumption, the *Berger* court decided it need not decide whether a presumption of adequate representation might sometimes be appropriate when a private litigant seeks to defend a law alongside the government or in any other circumstance. This is *Berger*, at Page 197.

In other words, the Supreme Court explicitly declined to overrule the Ninth Circuit's presumption in government cases. So this Court is still bound by the Ninth Circuit's government presumption.

Regardless, the League of Women Voters makes an argument that gets all three organizations past the presumption, I think. Specifically, the League argues that the government is not an adequate representative because it just wants to win the suit.

The League, however, has invested years of effort to create and then expand the mail-ballot-receipt period for California voters and, like the other two organizations, has created materials rolling out and educating voters as to the current law.

So it doesn't just want to win by whatever appropriate means exist, like jurisdictional or procedural arguments. It

wants to explicitly obtain a dismissal on the merits, which would confirm the lawfulness of the policy and would better insulate that policy from future attacks. This is all from ECF 29, at Page 9 of their briefing.

The Ninth Circuit has approved of just this kind of different interest being sufficient to overcome the presumption in government cases, citing to *Citizens for Balanced Use*, 647 F.3d, at Page 899.

In that case, the court rejected the presumption when, quote, "applicants seek to secure the broadest possible restrictions while the government would be satisfied with much narrower restrictions to comply with its statutory mandate."

After all, the Ninth Circuit has recognized that the government's representation of the public interest may not be identical to the individual parochial interests of a particular group just because both entities occupy the same posture in the litigation.

In addition, Vet Voice Foundation and the California Alliance for Retired Americans raise another argument that seems to overcome the presumption for all four proposed intervenors.

On March 25th, 2025, the President issued Executive Order 14248, which ordered the Election Assistance Commission to condition any available funding to a state on that state's compliance with his requirement that there be a

uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting. This is Executive Order 14248, Section 7(b).

The Executive Order explicitly states that a -- a state, such as California, would be in violation, quote, "by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives," end quote, citing to Executive Order 14248, Section 7(a).

State actors, including the Secretary, must be sensitive to budgetary concerns, especially when large amounts of federal funding are potentially at stake. Based on this Executive Order, California's federal funding might be vulnerable, depending on whether or how hard the State chooses to defend the statute here.

By contrast, none of the would-be intervenors have any such concern. Their only goal is to protect the current state of California voting law; that is, a mail-in ballot is counted, so long as it is postmarked by Election Day and received within seven days thereafter.

Given these facts, this Court cannot be assured that the Secretary is capable of making, and willing to make, the same arguments with the same strength as the would-be intervenors, to again mirror the reasoning and language of *Citizens for*

*Balanced Use*, 647 F.3d, at Page 901.

In that case, the court allowed intervention over the presumption when the unique circumstances left the court unsure of the government's representation. I think it's also worth noting that a bill is currently working its way through Congress to put statutory heft behind the Executive Order.

In any event, this argument alone, I think, is sufficient to make a compelling showing to overcome the adequacy-of-representation presumption.

A final point that I would make is that the Court notes that Vet Voice and the Mississippi Alliance for Retired Americans were permitted to intervene in a functionally identical suit, which ultimate- -- ultimately held that Congressman Issa's interpretation is correct.

That case was *Republican National Committee v. Wetzel*, 120 F.4th 200, Page 205, Note 2, Fifth Circuit case from 2024, which acknowledged the intervention in that footnote. So my tentative is to allow the intervention for the reasons that I've stated.

I did want to bring up one final point, however, that the briefing and analysis of the intervention issue raised for the Court, and I -- I wanted to give the -- the parties my tentative thoughts on that.

In opposing Morrison's intervention, Congressman Issa correctly pointed out that Morrison's interests in maintaining

the seven-day mail-in period may never be impaired. Specifically, Morrison might lose the primary and thus never face a general election in which that rule is at issue.

Yet it seems to me that same argument applies to Representative Issa himself. If Congressman Issa loses the primary, his right to run in the general election would similarly not be affected, one way or the other, by the general election's seven-day rule, at least potentially.

At any rate, because the general election candidates are still unknown, and no ballots have been cast, the Court has concerns about both standing and ripeness.

To establish Article III standing, parties must typically show, among other things, that they have suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent, citing to *Murthy v. Missouri*, 603 U.S. 43, at Page 57, 2024 Supreme Court case.

In the current context, ripeness overlaps with this injury-in-fact element of Article III standing, such that the inquiry is largely the same, citing to *Stavrianoudakis v. United States Fish & Wildlife Service*, 108 F.4th 1128, Page 1139, Ninth Circuit, 2024.

Congressman Issa has mentioned colleagues who lost their elections because of how California counts mail-in ballots, and those colleagues may well have a concrete injury in fact, but it's less clear to me that Representative Issa himself has an

actual or imminent injury that qualifies for purposes of standing and ripeness.

So my tentative thought is to set the following deadlines:

By June 6th, 2025, the parties must each file a brief, limited to no more than ten pages, addressing plaintiff's standing to bring this suit and the ripeness of his claim.

Two weeks later, by June 20th, 2025, each party may file a consolidated reply or response to every other party's briefing.

Then on July 11th, 2025, at 2:00 o'clock p.m., the Court would hold a hearing on the matter for oral argument.

I know this particular issue of standing and ripeness was not raised by the papers on intervention. So I'm not expecting argument on that at this time, but my -- my tentative is to go ahead and have the parties brief this issue because whenever the Court has concerns about standing or ripeness, it needs to drill down on that.

And so I want to make sure I have as full a record as possible to ensure that the Court has Article III standing -- or -- or the Court has Article III power to hear the case. But for now, I want to hear the parties' thoughts on the intervention.

This motion was brought by the proposed intervenors. Since my tentative is to rule in their favor, I think it makes the most sense to have the plaintiff's position heard first.

So, Mr. Lee, are you ready to argue?

**MR. LEE:** Yes, Your Honor.

Would you like me to come up to the podium?

**THE COURT:** Please.

**MR. LEE:** Thank you, Your Honor.

Eric Lee on behalf of plaintiff, Congressman Issa. I appreciate Your Honor's willingness to go through the -- the details of the case and the motion before you right now.

I do have just a few thoughts to start out with, and one of them was with respect to the interest -- but you had already addressed it in your opinion -- the interest with respect to League of Women Voters and their involvement in the legislative drafting and -- or their involvement in the statute at issue here and the resources that they expended in that regard and -- such as testifying.

Congressman Issa did not address that in his opposition, like you pointed out. We believe that -- we would concede that is a protectable interest, based on the Ninth Circuit case law that you -- that you cited in *Idaho* -- the *Idaho Farm Bureau* case.

The second thing is that the interest with respect to my friend Mr. Morrison -- we -- we characterized it as the interest related to the right to run for office -- for Congress, right to be elected to Congress. That should have been qualified to include the statement that it's contingent on late-arriving ballots, should that come forward, but Your Honor

just admitted -- just discussed that that is the weakest of the interests.

We believe that the -- the right to cast an absentee ballot or vote-by-mail ballot that arrives after Election Day is no different than an interest that any other -- in -- in a majority of states that require Election Day receipt. Our claims are centered on -- that all ballots must be received by Election Day and that, if you are a voter -- that you appear after the -- the deadline set by Congress.

And we allege that all -- all ballots must be received by Election Day. That's the deadline that was set by Congress in 1872, that you have no -- no -- that the voter has no greater interest in that -- that -- in that ballot being counted after Election Day than a voter that appears after the polling closes in person to vote.

And I would just note that the distinction between this case and the prior case that Congressman Issa brought against Governor Newsom in 2020 -- that involved an Executive Order during the COVID-19 pandemic that Con- -- that Congressman Issa alleged contravened the existing state law at the time in California, and that was the California Voter's Choice Act.

And that was supposed to be a rollout of vote-by-mail for all registered voters in every county in the state. And Governor Newsom, because of the pandemic, the global health emergency, issued the order that would have basically adopted

it in full without the -- without the state legislature's approval of that. The state legislature ultimately ratified that case -- that -- that Executive Order, adopted it into law.

And so our claims that the elections clause of -- under Article I, Section 4, that gives Con- -- that gives state legislatures the authority to set time, place, and the manner of regulations, subject only to Congress's authority to preempt those regulations -- that was unlawful, but it was eventually ratified into the legislature. So that case became moot.

But this -- this is not a -- this -- our -- our injunction in that -- Congressman Issa's injunction and request in that case was the distribution of the mail-in ballots in the first place. We are not challenging the distribution of any of the mail-in ballots in this case.

I think there are 400- -- according to the California Secretary of State's report on registration, there are over 490,000 active registered voters in the 40- -- 48th Congressional District. And each of those registered voters will receive a mail-in ballot if they're active, assuming they're active by the time the pri- -- primary and general election comes, and they will be -- have an opportunity to cast that ballot once they receive it.

And so timing deadlines -- and our citations to the Supreme Court cases in *Rosario v. Rockefeller* and in the statements by Justice Kavanaugh in his concurring opinion in

the Wis- -- in the Wisconsin case shows that the timing deadline, by itself, is not an unlawful burden on the -- on the right to vote.

And everyone has a -- has a right to vote. They must do so in a timely manner, and Congress has an interest in setting deadlines with that -- with that -- in that regard. And so that's our argument with respect to the voters that cast ballots by mail.

The argument that the -- so that -- that -- that is a -- I'm not sure what time -- how much time I have left. I wanted to jump quickly to the adequacy of representation.

We believe that Your Honor's analysis, with respect to the presumption that applies here, is correct and that the Ninth Circuit really looks at the overall goal between the parties' ultimate objective. And if the objective aligns, then -- then the presumption applies, and the plaintiff -- the intervenors must show -- must make a very compelling showing to show that they are inadequately represented.

The *Berger* court, like -- like Your Honor said, did not set that aside. The presumption, under *Arakaki v. Cayetano* and other cases, is still good law in this circuit.

We believe that the arguments that the -- that the proposed intervenors put forth -- first, they did not cite the presumption. They -- and their main arguments were that -- that they have different -- particular interests, distinct

interests. They may make arguments that the State may not make.

And your argument -- and Your Honor's determination that the State faces budget constraints, now that the Executive Order by President Trump was initiated that threatens budget constraints to the State -- I don't believe there's any evidence in the record that would show that the State has any budget constraints right now that would prevent it from making all the arguments that the proposed intervenors will make and defend their interest.

I will note just -- just quickly that the Executive Order itself, I believe, was enjoined by a district court recently in the District of Columbia.

**THE COURT:** When did that happen?

**MR. LEE:** That was a few weeks ago --

**THE COURT:** Okay.

**MR. LEE:** -- by Judge Kollar-Kotelly.

And I don't have the citation for that. I'm sorry, Your Honor.

**THE COURT:** Hmm.

That's okay. Thank you.

**MR. LEE:** But I'm willing to -- I just -- I just saw it in the -- in the reports, and I believe that one of the League of Women Voters' affiliates -- it may have been the National League of Women Voters -- brought suit -- were one of

the coplaintiffs in -- in that case in the District of Columbia that challenged the Executive Order.

**THE COURT:** Well -- so I did look at *League of* -- and we won't count this against Mr. Lee's time. I did look at *League of United Latin American Citizens v. Executive Office of the President*, which is 2025 Westlaw 1187730, Page 1, which is a District of -- District of Columbia case. This was April 24th, 2025.

But the court wrote, in that case, quote, "Because the Court agrees with those threshold arguments in some instances, the Court shall deny the plaintiffs' request for preliminary injunctive relief as to Sections 2(b), 7(a), and 7(b) of Executive Order 14248," but it granted it as to other sections.

So is that the case you were referring to?

**MR. LEE:** That is.

**THE COURT:** Okay.

**MR. LEE:** I'm not familiar with the entire order.

**THE COURT:** Uh-huh.

**MR. LEE:** I'll -- I'll have to look at that again. Off the top of my head --

**THE COURT:** It's about 200 pages long.

**MR. LEE:** Okay.

**THE COURT:** So I'm not going to have you read it right now.

(Laughter.)

**MR. LEE:** It wasn't in my briefing, and I did review it prior to the hearing, but I'm not -- I'm not 100 percent sure that that -- the provision with respect to funding for states that allow post-Election Day receipt, like California does --

**THE COURT:** Uh-huh.

**MR. LEE:** -- I'm not sure if that was part of the order that the Court enjoined there.

**THE COURT:** I guess my impression was that that part was unaffected, but I -- I certainly --

**MR. LEE:** Okay.

**THE COURT:** Like I said, it was 200 pages, and perhaps I may have missed something.

Please proceed, Mr. --

**MR. LEE:** All right. And I don't want to make any representations to the Court that may not be correct.

**THE COURT:** Uh-huh.

**MR. LEE:** So I just -- want to just -- just qualify that for the Court --

**THE COURT:** Certainly.

**MR. LEE:** -- very briefly.

The final thing that I think that -- with respect to standing, I think that the -- it -- the standing for Congressman Issa is slightly -- the standards for standing, like you pointed out, is different than the standards in a

Rule 24(a).

**THE COURT:** Hmm.

**MR. LEE:** If -- Mr. Morrison can certainly bring a lawsuit, if he wants to, or as a candidate for right to office if his rights are being violated, just like Congressman Issa has here, as -- under 9 -- Section 1983.

This -- the standing for Congressman Issa is slightly different as -- as an incumbent for office, and he has been in office for 20 -- over -- so there was a -- there was a two-year brief period of time where he had retired.

But he has been running for office since 2000 and has -- has electoral success for -- for each seats in the 48th, 49th, and the 50th. He's currently representing the 48th. He doesn't take any votes for granted. He will campaign just like he has in any other race, and so will Mr. Morrison.

And so the statement that -- with respect to Mr. Morrison's right to -- to be a candidate in the Rule 24(a) context is slightly different than in the Article III context, when you're trying to show injury in fact.

**THE COURT:** Okay.

**MR. LEE:** And I think that there's a -- there's a particular -- I don't want to go into it too detailed because it's not before the -- the Court right now.

**THE COURT:** Yeah.

I -- and I don't -- I don't want you to use up all of your

time on this because, as I said, I wasn't trying to catch the parties flatfooted with this argument. I do want to give you a chance to look at the law and -- and facts and brief it thoroughly before I -- I make you argue on that point, but I take your points.

**MR. LEE:** Yes.

**THE COURT:** Anything further on intervention?

**MR. LEE:** I would just note that the -- for permissive intervention, I know Your Honor did not rule on that. I think it's -- it's an alternative that Congress gave --

**THE COURT:** Uh-huh.

**MR. LEE:** -- the Court in order to grant intervention where an intervenor shows there's a common question of law and fact and undue prejudice. As part of that discretion, the Court must exercise, under due -- must -- must review undue prejudice and delay.

**THE CLERK:** One minute.

**MR. LEE:** But I think that several factors warrant against denial of intervention -- permissive intervention.

**THE COURT:** And if -- if I am convinced that my tentative is wrong on intervention as of right, I'll give the parties separate argument on permissive intervention, and I did consider those arguments as well.

**MR. LEE:** Okay.

**THE COURT:** I just didn't want to address that --

**MR. LEE:** Thank -- thank you, Your Honor.

**THE COURT:** -- if -- okay.

Thank you, Mr. Lee.

All right. Mr. Morrison?

**MR. MORRISON:** Thank you, Your Honor.

First of all, I want to thank the Court for the comprehensive analysis of the papers here. It was a masterclass. You did a really good job. So I don't have that much to say.

I just want to make two points, and that was I was actually asserting two interests in my motion, both my interests, as a candidate, to have my -- the ballots counted, which I understand the Court is not sure about, but the other interest is to have my own personal vote counted.

**THE COURT:** Uh-huh.

**MR. MORRISON:** I live in the district, and I vote absentee. And I don't know if the Post Office is going to get my ballot there within -- by the time the -- the day of the election or if it's going to come a couple days after, and I think that --

**THE COURT:** And my tentative is I disagree with you that the first one is a protectable interest, but I agree with you that your personal voting rights would be a protectable interest.

**MR. MORRISON:** Great. Thank you, Your Honor.

And the only other thing I would say -- I think my co-potential intervenors will probably talk about more -- is that the preliminary injunction in DC by Judge Kollar-Kotelly was only in part and did not protect against --

**THE COURT:** The funding.

**MR. MORRISON:** -- the application of the Executive Order in this context.

**THE COURT:** Uh-huh.

**MR. MORRISON:** And also, it was just a preliminary injunction anyway. It -- it could go the other way on final judgment.

**THE COURT:** Hmm.

**MR. MORRISON:** That's all I have.

**THE COURT:** Certainly.

Okay. Thank you, Mr. Morrison.

Why don't we hear next from the League of Women Voters.

Mr. Savitzky, are you going to be arguing that one?

**MR. SAVITZKY:** Yes, Your Honor. And good morning again, Your Honor. May it please the Court.

So the first and, I think, most important thing that I can do today is point out and acknowledge a few folks who are in the gallery.

Helen Hutchison, who's the Executive Director of the League of Women Voters of California, is here today, along with a number of local League members from the San Diego City and

San Diego North County Leagues. I want to point out their presence here today.

Their presence here underscores the League's extremely strong and unique interest in this case, both because they are the state's preeminent good government organization with 7,000 dues-paying member volunteers who rely on that receipt deadline both to vote and also to engage others in the democratic process as part of a massive coordinated voter engagement campaign, as we discussed, but also because the League has fought for this receipt deadline, as the Court discussed, in Sacramento and -- and in the political process and has made a decade-long investment in this critical pro-voter policy.

I think, beyond that, I -- I agree with most everything the Court indicated in its tentative ruling, and I would just make a couple substantive points, and otherwise I want to answer the Court's questions, if it has any for us.

Substantively, first, to address just two points that Mr. Lee made -- first of all, Mr. Lee made a point -- it's in their brief as well -- that the -- the timing deadlines are not necessarily unconstitutional burdens on voters. We respond to this in Footnote 1, Page 3 of our reply brief.

But, you know, just to hit the point here very briefly, the issue for Rule 24 intervention purposes is not whether timing is, on the merits, an unconstitutional burden under this sort of merits standard if you bring a constitutional challenge

to a state law.

The issue is just whether there is an interest in this law, in California law, as it stands today. And as the Court indicated, there clearly is. There clearly is an interest for those voters, and that's the only question for intervention purposes.

Second -- Mr. Morrison said it as well. I don't think we need to belabor it, but the Executive Order case did not preliminary enjoin -- preliminarily enjoin the aspect of the EO that deals with -- with -- with mail ballot receipt deadlines.

I think my friend from the Attorney General's Office is probably in the best position to -- to describe what else the attorney -- the State may or may not be doing about that, but it's a live EO, and -- and so I would just make that point.

And the last merits point -- and I think this goes to adequacy of representation. Obviously, that's -- that's sort of usually the -- the most complex issue in these intervention cases. I think the Court's analysis is right. Even if you apply the -- a presumption of adequate representation, it's overcome here, based on the overwhelming interest.

And just to concretize a little bit and -- because I know there's a -- there's a deadline on Monday for answers on our motions to dismiss, and we've reserved our right to -- to file a motion to dismiss. I'm thinking about the arguments that could be made on the merits. One of them is constitutional

avoidance.

Congressman Issa is saying that there's a single day in which all the -- all the voting and all the -- all the election administration work has to happen. And think -- if you compressed all of that into one day, there would be mass disenfranchisement -- there would be a risk of mass disenfranchisement. There would be a huge burden on voters.

And it would be, I think -- I think it could certainly be a constitutional problem that one could avoid by not interpreting the statute in the manner that Congressman Issa -- the novel manner, I should say, that Congressman Issa suggests.

Now, I don't want to bootstrap here. I used to work for a different state's Attorney General's Office, and state lawyers are not usually in the business of arguing that their own laws may be unconstitutional. But the League of Women Voters would argue that if there was a real risk to a mass disenfranchisement for voters.

So just to concretize the point that -- there are different arguments. There are arguments that the State may not make, may not be able to make for institutional reasons that -- that we -- we may well make, and you may see them very soon.

So I think the last point I would make is just that -- I guess I said already I agree with much of what the Court said, and I want to use my time to answer the Court's questions. So

if the Court has questions, I'm here to answer them.

Otherwise, we would rest on our papers and reserve my time for any rebuttal, if it -- if necessary.

**THE COURT:** All right. Thank you, Mr. Savitzky.

I think, since Mr. Lee has conceded your right to intervene, I don't have any further questions for you.

**MR. SAVITZKY:** Thank you, Your Honor.

**THE COURT:** Thank you.

Okay. Let's hear next from the California Alliance for Retired Americans and Vet Voice Foundation.

Mr. Hancock?

**MR. HANCOCK:** Good morning, Your Honor.

I want to thank you for your thorough consideration of the papers and the issues. I just want to highlight a few points.

The first is I think the Court is right to emphasize that Rule 24 is applied liberally and equitably, and this is most important in election cases. This is not a damages case where, if the representation is inadequate, you can file a separate suit or subsequent suit to get that money back.

If a ballot is rejected because it was received late, that can never be fixed later. So it is just better to let all the parties who have interests in at the outset, and that's consistent with how the district courts in this circuit have evaluated intervention in election cases, as you noted.

I also want to address the issue of interests. I think

the Court's framing that voters currently possess a legal right to have their ballot counted if it is timely cast but received within a week of the election is correct. That right is at stake in this case because it could be lost.

The plaintiff's framing, in responses to the interest question, really mixes merits questions with intervention questions. The inquiry is -- is a categorical one, not is something unconstitutional about to happen but is this the type of right that is legally protectable, and is that right affected by the case?

This is unquestionably the type of right that is legally protectable. It is a legal right they currently possess, and it is affected by this action. We don't have to prove that that outcome would be illegal or unconstitutional to achieve intervention, just that the proposed intervenors would be affected, and I think that's been established here.

On the question of adequacy of representation, I can confirm the Court's understanding of the current posture of litigation over the Executive Order. The preliminary injunction addressed some, but not all, of that Executive Order, and the provision requiring ballots received after Election Day be rejected was not part of that injunction. It currently remains in force.

But even if it was enjoined on a temporary or preliminary basis, as long as there is ongoing litigation and ongoing

dispute over whether California could be deprived of substantial funding for elections based on its acceptance of late ballots, that does affect the interests of the Secretary and does create a divergence of those interests from the proposed intervenors, who don't have those financial concerns.

I also want to address the question of the presumption. Our position is not that a presumption can never exist but that it only exists in much narrower circumstances than plaintiffs [sic] have represented, and there are sort of two main points of clarification.

One is I don't think it is appropriate to say that the proposed intervenors and the Secretary have the same objective. The Secretary's primary objective is to defend the State of California's ability to enact its own laws, decide how its elections will be administered.

That is not the proposed intervenors' primary concern, which is its constituencies -- elderly voters, disabled voters, current and former military members who may be stationed or living anywhere over the world, who depend upon this grace period -- to trust that their ballots will be counted, even if there are mail delays or logistical difficulties or medical issues that make it difficult to vote early.

The second thing I want to point out is, again, our position is not that the government can never represent these specific parochial interests but that that is only appropriate

when you have a narrowly focused government entity that is serving those interests.

And as an example, I would point to the *Arakaki* case, where there were proposed intervenors who said, "We need to be involved in this case so we can represent the interests of Native Hawaiians."

And the court said, "Actually, one of the defendants in this case is the Office of Hawaiian Affairs, which is a constitutionally created office specifically for the purpose of trying to serve Native Hawaiians and their land use interests. And because that narrowly focused government entity is here, serving that constituency, we will presume they will do an adequate job of doing so."

The Secretary is not a narrow, parochial-focused institution. It represents voters writ large and balances them across a host of administrative concerns. Perhaps if the California Department of Aging were in this case, an argument could be made there is a presumption they adequately represent the California Alliance's members, but that's not the case here.

I also want to point out that the Ninth Circuit in *Callahan* has essentially recognized that a compelling showing really should only be required when the interests are identical. And the most important inquiry is the interests, and those interests create the possibility that arguments and

positions will diverge later in litigation.

And it's appropriate to recognize those differing interests at this early stage and let all the parties in so there's no concerns later in the case if something was left out.

If the Court has any questions, I'm available to answer.

**THE COURT:** All right. Thank you very much, Mr. Hancock.

Let's also hear from Ms. Rosenberg, who's still with us remotely.

**MS. ROSENBERG:** I am still with you remotely, and I can provide a little bit more detail on the actions that are challenging the Executive Order issued by President Trump.

While it is true that the District Court in the District of Columbia did not enjoin Sections 7(a) and 7(b) of that Executive Order, it -- the reasoning for that decision is a little bit more narrow than we've discussed today.

The court, first of all, said that there was some difficulty in understanding what Section 7(a) even means and how the Attorney General of the United States could enforce the Election Day statutes. So that was a factor in her decision not to enjoin that section.

And in addition, the court in the District of Columbia noted that she wasn't sure that the parties -- or the plaintiffs in that case, the Dem- -- Democratic Parties [sic],

could actually procure the injunction that they sought. Instead, she said that states would actually be more likely to be the proper parties to secure an injunction.

And, in fact, the State of California, along with a selection of other states, filed the *State of California v. Trump* in the District of Massachusetts, challenging the same Executive Order. And they filed a motion for preliminary injunction on May 5th, seeking to enjoin the entirety of the Executive Order but in particular the sections that we're talking about today.

So there are states that are seeking injunctive relief there, and the court in the District of Massachusetts will hear argument on that preliminary injunction request on June 6th. So there will be a hearing in some other courts on whether or not the Executive Order will be enjoined as to the enforcement of Election Day statutes very soon.

**THE COURT:** All right.

**MS. ROSENBERG:** I don't have any -- the Secretary chose not to take any position on intervention. So we have no problem with the Court's order.

I did just want to flag for the Court that the deadline for the Secretary to either move to dismiss or answer the complaint is Monday. We plan to file a motion to dismiss on Monday, and that motion to dismiss will absolutely be covering the standing issues.

However, the parties, meaning the existing parties, not yet intervenors, met and conferred and have worked out a schedule -- a briefing schedule on the motion to dismiss and an anticipated motion for preliminary injunction that the plaintiffs stated that they wanted to file that would set the hearing on that a little bit further out, towards the end of July, to provide the parties enough time to brief both the preliminary injunction and the motion to dismiss to be heard on the same day.

**THE COURT:** Hmm.

**MS. ROSENBERG:** However, the Secretary does not oppose just focusing on the standing and ripeness issues first.

If we were to do that and to proceed with what the Court proposes, then we would ask that the Secretary's deadline to respond to the complaint be continued until after the Court has had an opportunity to address the briefing on the standing and ripeness issues and also that the Court would ask for the plaintiffs to hold off on filing their motion for preliminary injunction until after the Court considers the standing and ripeness issues as well so that we are not simultaneously briefing a motion to dismiss, your special request for briefing on standing and ripeness, and also a motion for preliminary injunction, which likely would be duplicative of all the things that we would be filing for Your Honor's consideration on the standing and ripeness issues.

**THE COURT:** I -- I appreciate you letting me know about that.

Standing and ripeness -- constitutional ripeness, at least, are both issues that I have to raise legally if the Court has concerns about them. But it may make more sense, in terms of efficiency, to let the parties' schedule prevail over the one I had proposed.

Anything else, Ms. Rosenberg?

**MS. ROSENBERG:** No. I would just say, again, the Secretary certainly would be happy to address the standing and ripeness issues before all other issues --

**THE COURT:** Uh-huh.

**MS. ROSENBERG:** -- if the Court was able to push out those deadlines and the consideration of -- of any motion for -- for preliminary injunction until after considering those threshold issues.

So --

**THE COURT:** Okay.

**MS. ROSENBERG:** -- we'd leave that to Your Honor, which way you'd like for us to go on that.

**THE COURT:** Thank you, Ms. Rosenberg.

All right.

**MS. ROSENBERG:** Thank you.

**THE COURT:** Well, Mr. Lee, given the number of parties making arguments against your position, I'm going to give you

five more minutes, if you need it, but you have your remaining time plus five minutes.

**MR. LEE:** Okay. Thank you. Thank you, Your Honor. I appreciate that.

I just wanted to note that we do concede the protectable interest with respect to League of Women Voters, but we do not concede that they are not adequately represented in this case. And so I think -- I just wanted to make that clear with respect to the presumption.

**THE COURT:** Right.

**MR. LEE:** Yeah.

And then -- so I just wanted --

**THE COURT:** I misspoke earlier. I appreciate you flagging that for me. Yes.

**MR. LEE:** Oh. Okay. Sorry.

And -- and I may have misspoke [sic] as well --

**THE COURT:** Yeah.

**MR. LEE:** -- based on what we've learned about the injunction in the District of Columbia. So --

**THE COURT:** Uh-huh.

**MR. LEE:** -- it's [sic] glad that that was -- that was corrected in time.

**THE COURT:** Uh-huh.

**MR. LEE:** The -- I just wanted to note that the nonprofits in -- in these election cases -- they always have

more specific interests than the state. And if -- and if -- and if that is enough to overcome the presumption of adequacy, along with possible budget constraints, which a lot of states face, budget constraints -- constraints, independent of any type of Executive Order from the President of the United States, that -- then the presumption would -- would almost always be satisfied in a state that has budget constraints and -- and --

**THE COURT:** Well, it's a little different here -- right? -- because the Executive Order, at least potentially, may create the budget constraint if they defend the statute as is, whereas general budget constraints -- it seems like a slightly different argument.

**MR. LEE:** That's correct, Your Honor.

**THE COURT:** Right.

**MR. LEE:** And I think that the -- the general public -- well, public -- budget constraints, coupled with the lack of evidence here that there's any argument that the -- that the State has -- isn't going to make on their behalf -- I think that that does -- that doesn't -- that does not rise to the level of a very compelling showing that the Ninth Circuit requires, if the presumption applies. And so that's our -- our position with respect to the presumption.

I know that the case in -- out of -- out of Mississippi that granted the intervention for -- for Vet -- Vet Voice and a

few other nonprofits there -- the case in the Seventh Circuit, in *Bost*, challenges a similar state election law deadline in Illinois.

The Seventh Circuit unanimously said that the presumption did not apply, but merely having separate, distinct interests by the intervenors -- there, I think it was the Democratic Party of Illinois. Having distinct interests, plus not being able to make all of the arguments, was not enough to overcome the default standard.

**THE COURT:** Uh-huh.

**MR. LEE:** And so I just would respectfully submit that the -- the way the -- the interests that -- the interests and the arguments and the evidence that the intervenors had proposed here does not overcome the presumption of adequacy of representation.

And so, because of that, then, they don't meet all of the elements of Rule 24(a) as required.

**THE COURT:** Okay.

**MR. LEE:** I'm not sure if Your Honor wanted to talk about the motion for preliminary injunction. We had -- before -- just going off-topic --

**THE COURT:** Uh-huh.

**MR. LEE:** -- Counsel -- Ms. Rosenberg and I had a videoconference on Wednesday, and we discussed proposed schedules for their motion to dismiss and our forthcoming

motion for preliminary injunction --

**THE COURT:** Uh-huh.

**MR. LEE:** -- that we plan to issue on Monday. We did not anticipate that the Court would -- would want briefing on -- on June 6th for standing and ripeness, but we're happy to accommodate that as well as moving for a preliminary injunction at that time.

**THE COURT:** Uh-huh.

**MR. LEE:** Just -- just something for Your Honor to consider.

And I don't know -- I don't have anything else -- any [sic] further at this point. So --

**THE COURT:** Okay.

**MR. LEE:** -- thank you, Your Honor.

**THE COURT:** Thank you very much, Mr. Lee.

Does anyone else wish to be heard in rebuttal?

**MS. ROSENBERG:** One -- one note, Your Honor, just quickly.

The *Bost* case that was just mentioned -- I believe the Supreme Court is set to decide -- or issue an order on Monday as to whether or not the petition for certiorari that was filed in that case will be granted.

So there will be further indicators as to whether the Supreme Court will be addressing the standing issues that were raised in *Bost*, and that would have implications here. We'll

have more information on Monday about that.

**THE COURT:** Okay. Did you have something further?

**MR. LEE:** And, Your Honor, the issue in *Bost* is -- is before the Supreme Court solely on the issue of standing. It's not on the merits.

**THE COURT:** Uh-huh. Right. Okay.

**MR. SAVITZKY:** Your Honor, could -- I can approach the podium or speak from here.

**THE COURT:** Wherever you're most comfortable.

**MR. SAVITZKY:** Just to point out, in terms of the substantive discussion, we discuss the *Bost* case on Page 89 of our reply brief. But if you look at the court's analysis there, they basically say the intervenors offer no argument whatsoever that they would make any divergent arguments from the -- from the state defendants.

And, obviously, this is a different case. You had pointed it out in the tentative, the different positions and divergence of substantive positions the intervenors would take, and we discussed avoidance. Constitutional avoidance is one very concrete example of that divergence as well.

So I think that's a pretty clear distinction from -- from the *Bost* case.

**THE COURT:** Okay. All right. I'm going to take a brief recess to take a second look at the DC case, *League of United Latin American Citizens*, and consider the parties'

arguments.

I'll also take a look at scheduling, as far as the standing and ripeness issues go, and then I'll come back out and give you my final ruling.

**MR. SAVITZKY:** And, Your Honor, if -- if the Court plans to address scheduling when you come out, I would just say, to the extent that intervention is granted, we would ask that we be able to -- to make a motion to dismiss on whatever the earliest possible schedule is --

**THE COURT:** Hmm.

**MR. SAVITZKY:** -- lined up, obviously, with all other -- all other dispositive briefing that's --

**THE COURT:** Certainly.

Okay. All right. I will be back out again shortly.

(Recess taken at 11:06 a.m.)

(Proceedings resumed at 11:27 a.m.)

**THE CLERK:** Remain seated and come to order. We are once again on the record.

**THE COURT:** All right. I appreciate everyone's patience while I considered the good arguments during the hearing.

I did take another look at the DC case, and it did not enjoin the relevant portions of the Executive Order, which I think Mr. -- Mr. Lee agrees with.

With regard to the argument Mr. Savitzky made, I believe,

about what's -- what *Berger* requires, I think -- I looked at that again.

I think you may accurately have -- have forecast where the Supreme Court is going, even with regard to the government presumption. But they explicitly did not touch the government presumption, which prevails in the Ninth Circuit at least, and so this Court is bound by that. Nonetheless, I do think it's overcome here.

I also took a look at the Seventh Circuit case, Mr. Lee, that you mentioned. It -- I think there are a couple things that distinguish it here. First of all, the analysis is based on Seventh Circuit precedent, and the treatment seems to be a little different in the Ninth Circuit.

Also, the Seventh Circuit wasn't dealing with the Executive Order that's come down, which I think is an important point here, regarding the adequacy of representation. So I -- I did take a look at that, but I don't think it changes the Court's analysis, based on Ninth Circuit precedent.

And I do think -- perhaps the adequacy-of-representation prong wouldn't be sufficient merely based on the divergent interests that the League of Women Voters pointed out. I think perhaps it does, but the Executive Order, I think, really does push the intervenors -- or proposed intervenors over the top here.

It does create a financial incentive for the Secretary of

State to potentially abandon this suit. I'm not saying they will. I mean, they may, you know, fight it to the hilt.

But there is that financial incentive there potentially for them to -- at the most, to abandon the suit and -- or to take lesser actions that -- to try and deal with it on procedural grounds, for example, which I think distinguishes their -- their interest in the suit from the proposed intervenors.

And I think that financial incentive alone is -- is enough to get the proposed intervenors over the -- over the presumption here.

So, in short, I will confirm the tentative ruling that I made earlier, and I will grant the motions to intervene in part, as I've stated in my tentative. And what I'm going to do, with regard to the standing and ripeness issues, is -- now that we have new parties in the case, I would like to get everybody on the same deadlines.

So I'm going to ask all parties to meet and confer regarding an appropriate schedule and then to get back in touch with the Court for setting an appropriate hearing date and deadlines for the parties to file motions to dismiss, preliminary injunction motions, anything of that nature.

The one addition, though, would be that any motions to dismiss must address the standing and ripeness issues that I identified earlier, but I think that's the most efficient way

to deal with everything.

Any questions about the Court's order or need for clarification?

**MS. ROSENBERG:** Yes, Your Honor.

Because the Secretary's deadline to move to dismiss, based on the current -- the most recent order of the Court, is Monday --

**THE COURT:** Uh-huh.

So --

**MS. ROSENBERG:** -- is the Court's ruling here --

**THE COURT:** -- that --

**MS. ROSENBERG:** Would that push that out so that all parties can --

**THE COURT:** Yes.

I would vacate -- I would vac- -- in light of the new parties that have been admitted to the case, I would vacate all existing deadlines relating to motions to dismiss, and I would ask the parties to meet and confer, and we'll set new deadlines and a new hearing date.

Thank you for that.

Anyone else have questions --

**MS. ROSENBERG:** Thank you, Your Honor.

**THE COURT:** -- or clarification?

**MR. LEE:** Yes, Your Honor.

Would -- would that apply also to the preliminary

injunction as well?

**THE COURT:** Yes.

**MR. LEE:** The schedule?

Okay.

**THE COURT:** Yes.

I'd ask you to meet and confer about that --

**MR. LEE:** Okay.

**THE COURT:** -- and then -- obviously, if the parties can't agree -- it seems like the parties are getting along well. So I don't anticipate any problems, but the -- you can seek court resolution. But my hope is the parties can come up with a good schedule that works for everyone, and we'll implement that.

All right. Anything further from the parties?

**MS. ROSENBERG:** Thank you, Your Honor.

**MR. SAVITZKY:** No, Your Honor.

**THE COURT:** No?

**MR. MORRISON:** No, Your Honor.

**THE COURT:** Okay. Well, thank you very much for the argument. We'll see you next time.

Take care.

**MR. LEE:** Thank you.

**MR. SAVITZKY:** Thank you, Your Honor.

**MR. HANCOCK:** Thank you.

**THE CLERK:** That concludes all matters for today.

We're now off the record.

(Proceedings adjourned at 11:33 a.m.)

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, May 27, 2025

/S/ James C. Pence-Aviles

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter